Good morning, Your Honor. May it please the Court, my name is Katherine Kimball Windsor and I represent the appellate in this matter, Kenneth Sung Park. Mr. Park has finished serving the custodial portion of his sentence. He has been deported based on this conviction to South Korea and his hope is that after this appeal he will be able to reopen his deportation proceedings and return to Los Angeles where his wife and son reside. Mr. Park raised three issues in his opening brief. The first was a hearsay issue under Rule 801 D1B. He also raised a Sixth Amendment counsel issue that occurred post-trial as well as a new trial motion which has two parts, a Crawford issue and also a challenge to the stipulation that the banks were FDIC insured. So I'll start with the hearsay issue. This concerns the admission of the cooperating witnesses earlier statement to the FBI. This was the cooperating witness was Mr. Kim who had earlier given, gave a rather unusual story at trial. And then the government was allowed to introduce, after the defense cross-examined, the government was allowed to introduce an alleged prior consistent statement that corroborated this $300,000 loan that Mr. Kim and his wife had made to a mysterious character, Mrs. O or Ms. O. And the main problem with this was that the defense had quite deliberately and carefully not suggested recent fabrication. I'm not sure that I would necessarily agree with that. There was certainly cross-examination on bias and motive and you'll get a lenient sentence, won't you, if you cooperate. And isn't that, taken as a whole, wasn't the cross-examination enough to imply that this was all made up? I think that's absolutely what the defense attorney was stating, was that this story was completely ludicrous. But I think what's key is the timing, that the defense lawyer never challenged, the defense lawyer even brought out, you went to the FBI with this story. And that's what the government was doing by bringing in that statement, was corroborating that he'd gone to the FBI. But the defense lawyer had acknowledged that and hadn't challenged that. This was really pretty standard cross-examination of a cooperating witness. And I think if this is enough to bring in a prior consistent statement, then there's really no, there's, the rule is open that anything can come in. And that's what the Supreme Court talked about shouldn't happen in this case. That there has to be some, that just basic, your basic garden variety cross-examination. For a cooperating witness, the defense lawyer is always going to say, you know, isn't it true that you're getting some benefit from your cooperation? That's very standard. Well, leaving aside whether being standard makes any difference, I guess my other question is, where is the prejudice from the specific statement that you're objecting to? I mean, that's a prerequisite for reversal on the ground of admitting a piece of evidence that shouldn't have come in. Where's the prejudice? Right. I think that there are a couple things. One is that this prior consistent statement, the one that the government was allowed to introduce, which was really carefully tailored, it opened this entire other can of worms that Mr. Park had been partners with this Ms. O who was running an enormous alien smuggling mortgage fraud ring. So first of all, we have this prejudice that he suddenly partnered with this criminal. There's also this kind of bizarre check that was introduced that didn't have any date or payee, but had Mr. Park's signature allegedly, although there wasn't any handwriting. Is that part of the prior consistent statement? I don't, I mean, it shouldn't have been, but it did come in as part of that. I guess couldn't that have come in without violating 801D because it's not a statement. You know, I mean, it's just extraordinarily prejudicial and hadn't really been verified, but it came in through the testimony of this FBI agent who was called under 801D1B. It was brought in as part of the prior consistent statement, whether it could have been introduced. To say that it's part of the same witness's testimony is not the same thing as saying it was a prior consistent statement. I mean, the agent could testify to perhaps numerous other things without ever mentioning the statement. So that's what I'm trying to zero in on. What specifically was the statement, and in view of all the evidence in the trial, what difference did it make? Well, we had this FBI agent who wasn't part of the case. You know, a guy, a nice guy from San Diego who comes up and testifies, and in a sense, in essence, ends up bolstering the story of Mr. Kim, because it was kind of a crazy story. But here you have this FBI agent coming and testifying for the government saying, yeah, you know, he told me this before. And so it creates this situation where it's almost like this independent FBI agent is, you know, is bolstering or agreeing with the testimony of the cooperating witness that was otherwise pretty bizarre. And so I think for that reason, it was prejudicial. And Mr. Kim was the one, there was circumstantial evidence about, you know, that Mr. Parker was present at the closing and body language and him pointing to, you know, where to sign. But in terms of, you know, it's very powerful to have somebody saying, you know, I was doing this because he told me to do it. And that was the government's main evidence that Mr. Park was the one calling the shots who had really organized this whole scheme. So for that reason, it was very prejudicial to have this FBI agent coming and confirming that what Mr. Kim had testified to was accurate in essence. You also raised an argument about the limitation of the cross-examination of the... Right. So at the point, once the statement came in, the government, the defense at that point, which had tried to avoid bringing this statement in, once it was in, the defense started cross-examining and saying, well, you know, wasn't there this prior loan? And at that point, the government objected. The objection was sustained. And then it came out in a closed hearing that there was something that I don't even think the defense knew about, but that this witness or Kim had been escorted down to San Diego by another person who was cooperating with the government and was actually meeting with his handler, and that's why he'd been in San Diego. And that wasn't known to the defense, and also created this whole other issue of, you know, what was the reason that Mr. Kim had gone there, because they were reporting the conduct of this Ms. O, this criminal ring, but they'd also been involved with her, and they'd given money to her, and they'd apparently been present for one month observing her criminal ring that she was running. And so it's... And there was no suggestion at that point, though, that the FBI certainly was interested in pursuing Mr. Kim, was there? No, there wasn't. I mean, in fact, there's not much in the, there's nothing in the record in terms of, or there's nothing in the report about this other character who'd brought them down. It's, you know, all we have in the record is the 302 report and then the government statements at the hearing about who this other person was. So, you know, I mean, I don't think there's anything in the record that we know what was going on, but it certainly is very suspicious at that point that they were down there giving this, telling this strange story about their involvement in Ms. O's criminal ring to the FBI agent. And the defense was not allowed to cross-examine about the, about this man who drove them down to San Diego, or about the prior loan, $270,000 loan that was made to O's associate Cho, which made the story even more unbelievable. And so it was error for that statement to come in, and then that error was compounded because the defense was not allowed to cross-examine on those additional unusual facts. So I could turn to the counsel issue unless there's any other questions on that one. The counsel issue was a post-trial one, and I, again, think this was a strange situation that Mr. Park ended up with three counsel post-trial who did not order the transcript to review it to see if there were any issues with it. And he did not have any issues to file for a motion, for his motion for a new trial or for his Rule 29 motion. And then he had this other lawyer who became very ill and ultimately was removed from the panel because he was not able to continue with his cases. And because of this strange string of events, and also that the case ended up getting transferred to another district court and then back again, Mr. Park ended up being pegged as someone who was deliberately delaying the proceedings, kind of being a troublemaker. I think by the end it seemed that everybody was irritated with him and just wanted to get on with it. Well, the court just didn't believe him. For example, he said, well, I never received the presentence report, and the judge says, well, we discussed it with you in court previously, so you had access to it. So, I mean, there's at least implicitly a credibility finding here. How does that play into our review for abuse of discretion? I think that was the only time that there was really a credibility issue. And on that occasion, he had been previously asked if when he was represented by the lawyer who ended up getting sick, if they had the language, had he seen it before, and he said that he had. And then when he was representing himself, he said he didn't have it physically. Regardless of that, there were language issues, he was a layperson. It's not even clear that he knew what the presentence report was, necessarily. But aside from that, I would say that it's pretty basic when you're appointed to represent a client on a motion for a new trial that you have the transcript. I mean, for the lawyer to go in and tell the judge, there's no issues here, and, in fact, it would be, you know, it's basically suggesting that the defendant was going to support perjury by filing a new trial motion. Wasn't that the basis for the first two or maybe even three lawyers saying, we just are not going to, we can't in good conscience file this new trial motion because, and I gathered, just kind of reading between the lines, because they thought he was going to further jeopardize himself. Right. I think that's absolutely it. I mean, I have complete sympathy for the lawyer who's saying, let me get this straight. You want me to file a motion for a new trial saying that your lawyer, who's one of my colleagues on the defense bar, altered this stipulation to an element at trial. I mean, you've got to be kidding me. And all of us as defense lawyers have been in the situation where a client is making kind of an outrageous demand. And I don't, I mean, I don't dispute that it was the lawyer's decision about what motions to file. And there's a great CJA bar on the central district. But when a district court is faced with the sort of situation that you and Judge Watford are discussing where a client is asking for something, in your terms, outrageous or unethical to happen, why can't the district court say, you know, three lawyers are enough, and you're going to have to proceed on your own if you can't make any kind of reasonable relationship with a representative? Isn't that open to the district court at some point to do that? I think what is very odd about this situation was that it was on the record. I mean, I agree that the district court was a difficult situation. Can you answer the question, can a district court do that at some point, say enough tries are enough? Not in the situation where nobody ever ordered the transcript. I mean, what, in this situation, what happens is that the lawyer needs to get the transcript and say, you know, of these 15 crazy claims you want to raise, you know, 13 of them are lunatic. But there's these, you know, two, there's a Crawford issue. I mean, there were some good issues here, and a lot of the issues, I mean, his motion for a new trial in Rule 29 motion is 50 pages long, you know, headache-inducing to read, it had all kinds of stuff that shouldn't have been in there. But there was, I mean, hidden within were some good issues that if he'd had a lawyer who had gone over the record, could have filed some meritorious issues. I mean, the issues I raised at the end, particularly the Crawford issue, which was one that he came up with on his own, is really interesting, and, you know, it's right at the forefront of Crawford litigation and what's going on there. If he'd had a lawyer who'd actually reviewed the record, there were some meritorious claims. But the lawyers never got past just their initial meeting with him, apparently, reading between the lines, where he was telling them some crazy ideas. MS. MILLER. Counsel, you're just about out of time, but we'll give you a minute for rebuttal when the time comes. MR. MILLER. May it please the Court, I'm Douglas Miller, I represent the United States, the appellee. As indicated, there are several issues that this panel has been asked to consider to determine whether Judge Fairbank erred in her handling of the defendant's trial and post-trial proceedings. The first that opposing counsel discussed was the issue of whether or not a statement that was made by a government witness to the FBI years before his arrest should have come in as a prior consistent statement. The standard that this Court should apply in determining whether or not that was an appropriate decision is an abuse of discretion. And maybe, though, you could just jump to counsel's point, which I think has some merit in my mind, that there really wasn't any charge of – there wasn't any change in terms of his motive to lie between the time he gave that initial statement and the time he was testifying at trial, right? So maybe you could just address that. Why was there a need to introduce this prior consistent statement? I mean, you're only able to do that to rebut a charge of recent fabrication, so that would mean that presumably the motive to lie arose after he, I guess, had agreed to plead guilty and cooperate? And what was the – I didn't see much in the cross-examination that suggested that that was defense counsel's theme, other than this is just a ridiculous story to begin with. Well, you have to go back to the opening statement of the defense counsel. What was important to understand for the jury was that these were not, as the defense would have them believe, two people who were friends with a complicated relationship going to a closing, one who speaks better English than the other, and the person who speaks better English getting sucked into a conspiracy. That was the defense's theory, and they put it forth in the opening statement. Therefore, what became particularly important to the government in presenting its case was to offer a different explanation for why the defendant, Mr. Park, was present at that closing. And what it did was ask Mr. Kim, his cooperating witness, to explain to the jury what the circumstances were when he met Mr. Park. And that's where we jump into the $300,000 loan. And after Mr. Kim gave the explanation, which I won't go into, I think we all understand what it was, then Mr. Park, on cross-examination, went after that, again, understanding the importance of it, which is if I could nullify this motive argument that the government's putting forth and make it seem like I'm just an innocent translator, that would be key to my defense. And so what did he do? On cross-examination, he started to attack the $300,000 loan, coupled with the notion that the defendant was going to, pardon me, the government witness was going to be receiving a benefit for the government for putting forth that explanation. I submit that those two things were clearly, the import of that was to suggest that the defendant, pardon me, that the government witness had created this story after he became a government witness, and that he did so to curry favor with the government and get a reduced sentence. Were you trial counsel for this case? I was, ma'am. And is that why you brought this witness in to testify, because it was your view that at that point there had been an attack on his credibility? With respect to Mr. Special Agent Kim, whose last name happens to be the same as the government's cooperating witness, he was called to testify, yes, after I realized that they're trying to nullify why these two individuals were at the bank together, I felt it appropriate to say, no, this wasn't fabricated to try to offer an explanation for why Mr. Park was there by the government's cooperating witness just to  And I don't think he would have ever had that motive to fabricate. Well, certainly it's always open to say that even with a prior consistent statement that the person's been lying all along. That's true. And that's why the rule offers certain protections to defense counsel, primarily that the witness for whom we're going to offer this prior consistent statement be available for cross-examination. And that protection is particularly important for some of the things that the defense, pardon me, appellate counsel has pointed out, like minor inconsistencies, and what was available to the defense counsel, but he sort of chose to do, but not to the degree I think appellate counsel would have appreciated, was to cross-examine Mr. Kim, government's cooperating witness, about various discrepancies, whether or not there was a $300,000 loan, whether or not this was being offered just to curry favor with the government. What's your response to opposing counsel's argument that if this is allowed to foster a prior consistent statement, that there is no limit to prior consistent statements in criminal trials? My response to that is if, I think the expression standard cross-examination was used to try to bolster that argument, that, look, this is what every defense counsel does, well, there was some difference here, because we weren't talking, or what happened at this trial was not that the defense counsel launched into a discussion or cross-examination about the benefits that someone might receive. He also went into the credibility and the plausibility of the $300,000 loan. And so what he sought to do, in my opinion, and I was there, was to make it seem like the $300,000 loan, you'll have a split between the two, is it that you believe that there was this $300,000 loan, is it what you're trying to convince the jury of is that there was this $300,000 loan and that's why my client was there, and isn't it true that you're getting a benefit from the government? I think when you couple those two things together, what the clear import is, is that he's suggesting to the jury that this guy made this story up because he wants to get the benefit from the government. And I think what the rule 801D provides is if that implicitly is brought out, that I can then bring in evidence and say no, that's not what happened, because yes, you can cross-examine him about whether he was lying all along, but at least under the rule, I'm now allowed to bring in evidence to show that he made the same statement before he had this agreement with the government. And why he was with the FBI, the defense, or the appellate counsel suggested that the reason he went to the FBI was he feared he had exposure because he had witnessed Boo Ja Oh's criminal reign. If you look back at the testimony, what you'll see is that Mr. Kim said he was exploring his options, essentially. He was trying to find out how to remedy the situation after his wife had been defrauded out of $300,000. He said he went to the FBI, he spoke with investigators, he spoke with lawyers. At no point did he even indicate or suggest that he had a concern that he may have somehow committed a crime. And so I think with that circumstance being present, that there was no motive to fabricate, and it was far from an abusive discretion for Judge Fairbank to make that determination. But if I could, I just was looking at your brief where you lay out in sequential, not sequential order, but all of the cross-examination questions that you say kind of join those two themes. You are expecting to get a benefit, and what about this ridiculous story? But I heard your answer to Judge Rawlinson's question. What it suggested to me is that you do agree with defense counsel that basically any time a defense lawyer crosses a government informant-type witness and both ask, isn't it true you're expecting to get a benefit, and in any way challenges the credibility of some portion of the witness's statement, which they're always going to do because, of course, that person is there to harm their client, so they're always going to have to challenge the credibility of the testimony. Whenever those two things are present in the same cross-examination, your answer, I think, is that, yeah, I get to bring in any prior consistent statements I can possibly muster to bolster that witness's credibility. I am bringing that prior consistent statement to not bolster the witness's credibility, but to rebut the notion that that one piece of testimony, the $300,000 loan, was created to get the benefit out of a cooperation agreement. To turn it on its head, when would we be allowed to come across and bring in something that there has been the argument that the witness is fabricating this one piece of evidence to get a benefit, I think the distinguishing fact in this case was that he actually referenced the $300,000 loan and did so rhetorically and suggested that it was a fabrication. And then, in the context of that, started to talk about the merits, or pardon me, the benefits he would receive under the cooperation agreement. I think we would be in a different situation if we had just one or the other. But I think when you bring them together, now we're in a position where the government can now bring in the evidence, and we laid that out, and I'll stop there if that addresses your question. With respect to the admission of the evidence, I do think the focus should be on harmless error here. It makes it, frankly, an easier analysis because of the overwhelming evidence against the defendant. There were two witnesses that were at the closing that were not Mr. Kim. There were Mr. Royo and Special Agent Kim, and they both testified that the defendant was calling the shots, that he answered all the questions, that it got so bad that Mr. Royo had to basically forbid him from answering more questions. Then when he's arrested, and this is subtle, but if you look at the record, when the defendant was arrested, what they found in his possession, not in Mr. Kim, were several notes that he had taken, including one in his wallet, about the details and circumstances of how that loan was obtained. That was very powerful evidence. Also, again, the basic confession that everyone in Koreatown lies on their loan application, and it's common sense to put what you need in the loan application. All of that was before the jury when they rendered their decision. I thought, I guess, what you just said seems a little inconsistent with what you said at the outset, which was this $300,000 thing was critical for me to be able to rebut the defense theme that they laid out in the opening statement. As a prosecutor, you want to have all the evidence that you can bring forth to show that the defendant's guilty, and there are multiple avenues to pursue. One of the avenues was the evidence that was found on his person. Another avenue was if the defense wanted to suggest that the witness was lying, the motive, that, hey, here's why they did it. I put forth my witness and said, explain to the jury what happened. Why was he there? The defense chose to attack them and suggest that it was fabricated just for the benefit of a cooperation agreement, and then it became more important because they chose that line of attack to rebut that. Before you run out of time, would you respond to the issue about the appointment of counsel for sentencing? Yes, Your Honor. What really is at core with that issue is when is enough enough? When can a district court judge who has articulable reasons for feeling that, determining that, that the defendant is simply hindering the efficient administration of justice, manipulating the judicial process, say, enough is enough, I'm going to force you to go forward with these proceedings, even if it results in you not having counsel. This was the case where enough was enough, and the judge was justified in doing that. What was at issue, and it was touched upon when appellate counsel was arguing, Mr. Park wanted to bring a motion for a new trial that would be centered around a false declaration proclaiming his innocence. That was the root of all the problems that he had with the four lawyers that he got after trial. It started with Mr. Worksman, who said to the court in that closed proceeding, I didn't know it at the time, but I learned after reading, that, look, he wants me to file a motion that I can't file. Then he got Mr. Reid. Mr. Reid, I'm familiar with the case, filed an excellent motion arguing that he should now be allowed to bring the Rule 33 motion and Rule 29, but even he, once he learned a little bit more, said I can't bring these motions, they're essentially frivolous, because it's in the record what the defendant had done was admit to the government in the context of a proffer session that he had committed all of these crimes. And so what became a stumbling block, without the need for reviewing thousands of pages, or maybe it's not thousands, but hundreds of pages of transcripts, was the defendant is adamant to file a motion proclaiming his innocence, yet we have the contrast of a stumbling block persisted through all of the attorneys he got after that, and it came to the forefront almost immediately. It was telling that Ms. Brewer, who was I think the final lawyer appointed for him, said, and I quote, I think the issue is that the defendant believes in his mind that if he files a Rule 29 motion, the court will grant it and he can walk away. He doesn't want to engage, does not want to proceed to sentencing. So not only do you have defense counsel telling you, look, he won't let me file motions that might help him, he just wants to file this one motion that he thinks is going to get him off. So, you know, there was an argument that, oh, maybe they could have reviewed the record for other claims. No, Mr. Park wanted one motion, innocence, and you can see that it continues up until his sentencing papers he's proclaiming his innocence. And so that was going to be the stumbling block throughout. Can I ask, was he in custody this whole time? He was, Your Honor. That was another, well, yes, he was. I mean, I don't know, what's the prejudice then to the government or to the court? I agree that at some point you've got to be able to say enough is enough, but I'm just, what was the prejudice on your end? I think the prejudice was, you know, at a time when, there comes a time when the court has to start looking out for the defendant because he's not looking out for himself. And what was in the air, and I can see that it's difficult to see in the transcript, was the defendant has been in custody on a relatively minor offense for almost 21 months, and we still haven't gotten to sentencing, and he has this crazy notion that he's going to walk away. And that's not going to happen, and none of the lawyers that I can give to him are ever going to be able to appease or disabuse him of the notion that he's going to go home free. And I need to move this case forward because I think the judge understood what... The sentence might be shorter than what he served. That's correct. And so what I submit, what the court could consider is, at the length of time that Mr. Park had been in custody, at the time that this very late motion for reappointment of counsel came, what was something that the court must have considered, given the nature of the offense and the likely sentence he would receive. And finally, you know, when the 21 months came, there was this discussion about Mr. Deitch and whether or not that really had to do with his illness. Again, the delay is a factor, but there was also an apparent breakdown between the defendant and his counsel and an unwillingness to accept that they are not going to file motions that are proffered by a false declaration. Thank you, counsel. Your time has expired. You may have one minute. Thank you. Just responding to the counsel issue first, most of the delay, when you look at that post-trial delay, most of it was not Mr. Park's fault. In fact, you keep seeing in the record that he files motions when he's represented by counsel, and when he's in court and Mr. Deitch is very ill and the judge says, what do you want to do, do you want to just wait and hope that he gets better? He says, no, I've been working on these motions, give me a new lawyer. It's pretty clear that he never wanted to represent himself. He always said, I need a lawyer to help me file these motions, but he never got a lawyer that actually would review the record. And I am sympathetic to the fact that this was a difficult client who had some crazy issues and crazy ideas about what should be in that motion, but he didn't know what he wanted in there because he ended up filing it. And some of what was in there was really good. We can see what those issues were. Also, the quote that government counsel read from that final lawyer, Ms. Brewer, she at that point didn't even have the file. She couldn't even say what he was charged with, and yet she had advised him not to file the motion. And to me, I mean, given the quality of representation on the CJA panel, I think that every other lawyer on the panel would have actually gotten the record. That's what you do when you're appointed to represent someone in a motion for new trial. Thank you, counsel. The case just argued is submitted, and both of you were very helpful. We appreciate your arguments. We will take a ten-minute break, and we will return.
judges: Graber, Rawlinson, Watford